# EXHIBIT A

**Pages 1 - 50**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Vince Chhabria, Judge

| | | |
|---|---|---|
| K.R., an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| VS. | ) | **NO. CV 19-08252-VC** |
| | ) | |
| G6 Hospitality, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

San Francisco, California
Thursday, June 4, 2020

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
RECORDING 10:38 A.M. TO 11:46 A.M.**

**APPEARANCES**:

For Plaintiff:

WEITZ & LUXENBERG, P.C.
3011 W. Grand Boulevard - Suite 2150
Detroit, MI 48202
BY: **TIFFANY R. ELLIS, ESQUIRE**

WEITZ & LUXENBERG, P.C
1880 Century Park East - Suite 700
Los Angeles, CA  90067
BY: **MELINDA DAVIS NOKES, ESQUIRE**

For Defendant Marriott International, Inc.:
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, Md 21209
BY: **MICHAEL P. O'DAY, ESQUIRE**

(Appearances continued on the next page)

Transcribed By:          Pamela Batalo Hebel,
                         Transcriber

Exhibit A
Page 4

APPEARANCES CONTINUED:

For Defendant Marriott International, Inc.:
                        DLA PIPER LLP (US)
                        555 Mission Street  - Suite 2400
                        San Francisco, CA 94105
              BY:  **AMANDA L. MORGAN, ESQUIRE**


For Defendant G6 Hospitality, LLC:
                        DLA PIPER LLP (US)
                        2000 Avenue of the Stars
                        Suite 400 - North Tower
                        Los Angeles, CA  90067
              BY:  **SHANNON E. DUDIC, ESQUIRE**

**Thursday, June 4, 2020**                    **10:38 a.m.**

ELECTRONICALLY-RECORDED PROCEEDINGS

---oOo---

THE COURT:  This is case number 19-8252-VC, K.R. vs. G6 Hospitality, LLC, et al.

Counsel for the plaintiff, do you want to state your appearance?

MS. ELLIS:  Yes.  Good morning, Your Honor.  Tiffany Ellis with Weitz & Luxenberg on behalf of Plaintiff K.R.

THE COURT:  Good morning.

For the defendant?

MS. MORGAN:  Good morning, Your Honor.  Amanda Morgan on behalf of Marriott International.  Also, my partner, Michael O'Day, is raising his hand, and we'd hoped that he would join this hearing.

THE COURT:  Oh, sure.  Let me go back.

And then I see Shannon Dudic also.

MS. ELLIS:  Your Honor, on the Zoom call, I believe I have two co-counsel.  One may be arguing at some point, but Melinda Davis Nokes, she is our California lawyer on board.  She may or may not be arguing, so I defer to you as to whether you want to put her on the screen.

THE COURT:  All right.  Well, she just raised her hand.

So then, Ms. Dudic.  Is it "Dudic"?

MS. DUDIC: Yes, Your Honor.

THE COURT: Go ahead and make an appearance.

MS. DUDIC: This is Shannon Dudic on behalf of G6 Hospitality, LLC. I don't intend to argue, but as a party in the case, wanted to let you know that I was in the audience. So I'm fine if you want to push me back into the audience or (inaudible) during the hearing.

THE COURT: All right. So you're not arguing, is what you're saying?

MS. DUDIC: No, Your Honor.

THE COURT: Okay. Thank you. I'll go ahead and push you back into the audience, unless you prefer to be here.

MS. DUDIC: You can push me back into the audience, Your Honor. Thank you.

THE COURT: Okay.

And then, Ms. Nokes, do you want to make your appearance? You need to unmute yourself.

MS. NOKES: Sorry about that. Yes. Melinda Nokes on behalf of the Plaintiff K.R. Thank you, Your Honor.

THE COURT: Okay. So -- all right. So -- so you -- you got my order in which I asked you a bunch of questions about the vicarious liability. You're free to, you know -- you're free to tell me that I'm not thinking about the case correctly, and we can get into that, but before you do that, I want -- I want you to -- I want to know what your answers are

to the questions that I posed.

MS. ELLIS:  Certainly, Your Honor.  We --

THE COURT:  We'll start with Ms. Ellis.

MS. ELLIS:  Certainly, Your Honor.  And we appreciate the Court's tentative thinking that you shared with us through that order.  We really don't think that we need to get to these questions quite yet because we do believe there is direct liability, and I would like to go back to the participation and the venture issue really and outline the context for you why we have made the claims in the way that we have and why --

THE COURT:  That's fine.  But first I want to hear -- I'm happy to give you a chance to do that, but first I want to hear the answers to the questions.

MS. ELLIS:  Certainly, Your Honor.  And I will go through them in order, unless you'd like me to deal with it in a different way.

THE COURT:  Whatever -- whatever works for you.

MS. ELLIS:  Okay.

First, I'd say the liability of the chains for the local hotels' participation, is it a question of state law -- it's really unclear, quite frankly.  It really could be either state law or federal common law.

We think that there is examples of both and that this case is different than any other cases that we've found out in --

THE COURT:  When you say -- when you say there is

examples of both, do you mean that there are examples of both in -- in the context of this statute or -- or --

MS. ELLIS: No, Your Honor.

THE COURT: -- or in the context of other federal statutes?

MS. ELLIS: In the context of other federal statutes.

THE COURT: Okay.

MS. ELLIS: In the context --

THE COURT: So what -- okay. Go ahead.

MS. ELLIS: I apologize.

In the context of the TVPRA, we do not believe that there is anything on point determining which would apply if we were -- if we need to get to the point where this decision should be made. Either standard federal common law, which is a stricter standard, I believe, than California would recognize could apply.

As far as your second question about vicarious liability --

THE COURT: Well, before -- but -- but -- can we stick to the first question?

MS. ELLIS: Sure.

THE COURT: Because you -- are you saying -- it seems like you're saying that it doesn't matter for purposes of this motion whether it's federal common law that applies or state law of agency, vicarious liability.

**MS. ELLIS:** Well, we believe questions of agency are more appropriate for a summary judgment stage of the matter, Your Honor. That this is not -- these are not appropriate questions for a 12(b)(6) motion --

**THE COURT:** But don't we need to -- don't we need to understand whether federal law of agency or state law of agency applies at the -- at the pleading stage so we at least know what law to apply?

I mean, I suppose that if it were clear under both California law and federal law that this is something that -- that -- that, you know, you've stated a claim for agency liability, regardless of which law applies, you know, I suppose we could -- we could sort of pass over the question of which law applies and deal with that later, but I want to know which law applies, and that's why I asked you the question.

So what is your position on whether it's California law or federal law, and what is your support for that position?

**MS. ELLIS:** Okay.

First, I would say -- I would ask that we do pass over the question until the summary judgment phase where we think that it is more appropriate at the outset.

Secondly, either federal common law or California law could apply. We believe that California law would more appropriately apply here. If you're looking at --

**THE COURT:** Why?

**MS. ELLIS:** If you're looking at the choice of law provisions under federal law and California law, California applies a governmental interest choice of law analysis, and in this case, the trafficking occurred in California, human trafficking --

**THE COURT:** Wait. But -- but are you saying that I need to apply California law regarding choice of law to decide whether federal common law applies or California law?

**MS. ELLIS:** I'm saying that that is also an open question, Your Honor. There is no clear authority on the questions that you have raised, and so it can go either way.

**THE COURT:** Okay. So can you give me some -- you said there were examples going both ways.

So what are some examples of federal statutes that comment on the question of vicarious liability where courts have said that state law should determine that question?

**MS. ELLIS:** I can give you some examples of where federal common law has applied. There is one case --

**THE COURT:** But you're arguing that state law should apply, so do you have -- so -- so I guess my question is if you -- if you contend that state law of vicarious liability should apply, do you have any examples of federal statutes where it has been held that state agency law applies, other than, of course, the -- I mean, there are several district court decisions, you know, in the lawsuits that you've filed --

MS. ELLIS: Yes, Your Honor.

THE COURT: -- where courts seem to assume, without engaging in the question, that state agency law applies. But I don't -- it doesn't appear that anybody asked the question.

So, you know, are there any other federal statutes that were silent on the question of which law -- silent on the question of vicarious liability and courts held that it's state law of vicarious liability that should apply rather than federal law of vicarious liability?

Do you understand -- do you follow my question?

MS. ELLIS: I do follow your question, Your Honor.

And I'm just -- I'm trying to think of the best way to simplify what I want to lay it out, so bear with me for just a moment.

We believe -- I will say, Your Honor, that if the California -- if California law is the one that applies, we will rely on the cases in our brief for those, and those are not specific to federal statutes. I cannot cite a federal statute that is silent on the issue now that has applied California law.

THE COURT: Okay. And you said there are some examples of federal statutes that -- where federal common law was applied for determining vicarious liability. What are those examples?

MS. ELLIS: Correct. That's happened in the FDCPA

context, the Fair Debt Collection Practice, under the Fair Housing Act, the Digital Millennium Copyright Act, and the TCPA as well. But because this is --

THE COURT: So how -- why would -- why -- so you've been unable to find a federal statute where state law of vicarious liability was applied. You found a bunch of federal statutes where federal common law of vicarious liability was applied, but you're still taking the position that California law of agency liability should apply in -- in this case?

MS. ELLIS: Your Honor, we are of the position that either could apply, and we will -- either could apply. Under *Browning vs. Ferris* -- *Browning vs. NLRB* -- it's 911 F.3d 1195, it's a D.C. Circuit case in 2018 -- there is one example of where the statute was silent on the issue of which should apply, but they did analyze FLSA under various states' laws; however, they didn't give a reasoning for that. So there is one -- at least one example where the state law did apply --

THE COURT: You --

MS. ELLIS: -- when evaluating the law of agency.

THE COURT: When evaluating what? Sorry.

MS. ELLIS: When evaluating the law of agency.

THE COURT: And that was the FLSA?

MS. ELLIS: Yes, Your Honor.

THE COURT: What case?

MS. ELLIS: *Browning vs. NLRB*.

THE COURT: Okay.

MS. ELLIS: That's -- in the case -- yes. Yes, Your Honor.

THE COURT: Okay. And then so what is -- what is your -- what are your factual allegations that support the -- let's assume, for the sake of argument, that I do not believe that you've adequately alleged direct liability. Okay?

MS. ELLIS: Okay.

THE COURT: What are the allegations in the Complaint that support your assertion of agency liability?

MS. ELLIS: I'll direct Your Honor to paragraphs 75 through 87 specifically of our Complaint.

THE COURT: Give me one sec. Let me get there.

MS. ELLIS: No problem.

THE COURT: Paragraph --

MS. ELLIS: 75 through 87 and specifically paragraph 87.

And I will say, Your Honor, at the outset --

THE COURT: Wait. Hold on. Just give me one -- just let me get there.

MS. ELLIS: Yes.

THE COURT: Paragraph 87, you said?

MS. ELLIS: Correct.

THE COURT: And this is -- this is -- this is whether the local -- this is on the question of whether the local

hotels are acting as the agents of Marriott?

**MS. ELLIS:** Correct, Your Honor.

**THE COURT:** Okay. Go ahead.

**MS. ELLIS:** So I wanted to direct you to this paragraph first, but I want -- there's three separate allegations that we've made as it relates to agency and how Marriott has exercised control over these local hotels to establish an agency relationship.

At the outset, I will say that we do not have the franchise agreement between Marriott and Westin. That is not something that we possess. It's not something that's been produced. We've yet to have a case management conference in this case, and I will say that from other litigation in other parts of the country, we've asked for it as part of informal discovery, and Marriott and other defendants have been unwilling to provide that.

We do have some examples of franchise agreements that we pulled publicly from the internet, and I believe that those give us some -- some basis to believe that the allegations that we've made in the Complaint, specifically at 87, are factually true, but without the benefit of discovery, we will not have the proof of that.

And so to the extent --

**THE COURT:** Right. You just have to -- you just need to have a good-faith basis to make the allegations at this

point.

MS. ELLIS: Correct. Correct.

THE COURT: But I'm just curious, what franchise agreements did you pull from the internet? Are you talking about franchise agreements between these defendants and local hotels?

MS. ELLIS: We were able to find one franchise agreement between Marriott and a Fairfield Inn Hotel. It's not this specific hotel.

THE COURT: Got it.

MS. ELLIS: And to the extent that it -- to the extent that the franchise agreements are similar across their brand, we can make some assumptions, but we don't know that. And so without seeing --

THE COURT: (Inaudible.)

MS. ELLIS: Yeah. Without seeing it, we don't really know.

THE COURT: Okay.

MS. ELLIS: So on that subject, paragraph 87 -- and these are some very specific ways that we've alleged in our Complaint that Marriott exercises control, both day-to-day and on a general basis, over the Westin San Francisco Airport Hotel. It includes hosting online bookings through Marriott's domain.

If you go to Google right now and try to book --

THE COURT: Where could I -- could I -- I just want to -- I mean, mainly I just want to look at the allegations in your Complaint. So you're on page 18 now. Okay. Go ahead.

MS. ELLIS: Yep. So if you look at the number that we have -- we've outlined a number of items below that. Number one is online bookings.

If you go to rent a room at the Westin San Francisco Airport, right now you go to marriott.com and a subsection of that for that hotel.

THE COURT: Okay.

MS. ELLIS: Requiring, you know, of course using consistent -- well, Bonvoy, I think, is Marriott's brand program, and that's what number 2 references, is their customer points rewards program. Employment decisions -- I know in the exemplar --

THE COURT: You skipped over "setting employee wages." I was -- I was -- I was a little surprised when I read that. You're saying that Marriott requires the local hotels to pay employees specified amounts?

MS. ELLIS: We -- yes. By -- but, again, without seeing the individual franchise agreement, I can't say how that is laid out, but it is likely mandating that they comply with all state laws related to minimum wage. I know that in the sample franchise --

THE COURT: Well, that's different from -- requiring

somebody to comply with the local wage-and-hour laws is different from setting employee wages, isn't it?

**MS. ELLIS:** I don't believe that it is, Your Honor, because if they were to find that --

**THE COURT:** It's not setting employee wages. It's just telling them to comply with the local wage-and-hour laws. It's not saying you must pay your employees, you know, $25 an hour or whatever it is.

**MS. ELLIS:** You're right. It's not -- it's not specified as to what the actual amount would be, but what I was beginning to say about the sample Complaint -- for lack of a better phrase, I'll call it a sample franchise agreement that we were able to find on the -- on the internet.

One of the provisions that's in that sample agreement goes to whether managers and full-time, sort of, overseers of the local hotels -- what else they can do and whether or not they can have other jobs, and I can -- "a sales manager and reservation manager shall devote their full time to the management and operation of the hotel and they can't be employed in any other way" --

**THE COURT:** Okay.

**MS. ELLIS:** -- "by the franchisee." So that's just an example of, you know, facts that we found in the universe that support our allegations here.

Sharing profits is another -- another way that we believe

the agency relationship exists.  It goes to a number of other arguments that we have in this case.

Again, we have not reached the Rule 26 or case management conference here yet, but in other case management conferences, specifically in the Eastern District of Pennsylvania, we have gone through the exercise of trying to come to an agreement on stipulated facts.  And at least in that case, Marriott did propose some language to us that would -- that would, I guess, stipulate to the percentage of money that they received from the franchise both for room rentals but also for licensing fees and other sorts of licensing --

THE COURT:  I don't -- I mean, people enter into profit sharing agreements all the time without one being an agent of another; right?  I mean, I -- I don't understand why sharing profits speaks to the agency question.

MS. ELLIS:  I think it is looked at in the whole of what the relationship is between these parties, whether it's an apparent agency or whether it's actual agency, looking at what -- what level of control, whether -- not necessarily what control they did exert over the local hotels but what level of control they were able to exert over the local hotels.  And these -- each of these are examples of the types of things that we believe will show an agency relationship at the close of discovery, once we've had a chance to ask these questions and dive into what Marriott both was doing in its brand and other

places and with this particular local hotel.

**THE COURT:** Okay. I want -- I want to -- just one small comment is that a mistake that plaintiffs' lawyers often make is that they say *we need to find that in discovery, we need to find that in discovery*, and you've -- you've said that like five times now. When -- you know, when plaintiffs' lawyers start saying that, it's a sign that they haven't stated a claim in the Complaint.

You know, this is -- you know, we -- *we don't know because we need to find that in discovery* is never a good answer in response to a motion to dismiss. We need to look at the allegations of your Complaint and see if you've stated a claim, not -- and -- and the Complaint rises or falls on its own -- on its own words.

So --

**MS. ELLIS:** Your Honor, I understand. If I could just respond to that briefly, because I do think -- and I would like to get back to the context in which I think this decision needs to be made and why I think that that's important, where I had hoped to start the discussion, and I can do so without going into the direct liability issue, if you would like.

But right at this moment, I'll say looking at Marriott's website right now, another example that I don't need the benefit of discovery to find is a headline that says, "Marriott International has trained 500,000 hotel workers to recognize

signs of human trafficking." I'm quoting here. It says, "Marriott launched its mandatory Human Trafficking Awareness Program for on property staff in both managed and franchised properties in January of 2017."

So right now, today, on the public -- in the public sphere, they are telling everyone about how they control the day-to-day behavior of what is happening at their --

**THE COURT:** So that sounds -- although -- although I haven't -- you know, I haven't developed expertise on this -- this agency liability question yet because I haven't -- and I haven't even figured out what law applies -- that sounds very helpful to you, what you just read to me. Is that in the Complaint anywhere?

**MS. ELLIS:** It is not in this particular Complaint, Your Honor, but we do reference their ability to -- to have the training.

And so if I could just back up for a second and -- and really --

**THE COURT:** I appreciate your desire to back up, and you can back up, but I -- what I was hoping we would address first is the questions that I -- I posed to you a couple days ago.

**MS. ELLIS:** Yes, Your Honor.

**THE COURT:** And -- and so -- and, you know, my job is to -- is to read the Complaint, and maybe the answer is that

the Complaint needs to be dismissed with leave to amend, and you can do a better job of making allegations about agency liability, but in the -- as the Complaint stands now, what -- on the question of what a hotel front desk person is supposed to do when they're seeing signs of sex trafficking.

**MS. ELLIS:** Yes.

**THE COURT:** What -- what are the allegations -- where are the allegations in the Complaint that indicate that the -- the local hotels are acting as agents of the chains with respect to that area?

**MS. ELLIS:** Yes, Your Honor.

I will direct you to paragraph 63 of the Complaint in that defendant -- and our allegations that defendant knew at least as early as 2006 that human trafficking for commercial sex was occurring at its hotels and across its brand. At that point in time, they amended its human flight policy in 2006 to require -- to require an annual review of this. And it said it supports the elimination of all forms of force, bondage, compulsory level sex trafficking, essentially. So that happened in 2006.

In 2008, Section 1595 was amended to "require all companies with a particular proximity to human trafficking to do things. To use, one, reasonable measures to" --

**THE COURT:** Is this in the Complaint?

**MS. ELLIS:** It is, Your Honor. This is on page -- at

paragraph 60. I direct you there.

THE COURT: Okay.

MS. ELLIS: In 2008, 1595 was amended to require all companies within proximity to human trafficking, which would be hotel chains, including Marriott International, the defendant in this case, to, one, use reasonable measures and, two, conduct proactive audits to ensure they were not profiting from what they knew trafficking ventures were doing.

In 2000 -- so that right there we have Marriott in 2006 taking affirmative statements on their own about trafficking. In 2008, the liability under federal law changing -- or the responsibility, rather, under federal law changing. And then in 2010, the TVPRA was amended again to actually give them liability for their failures to meet the 2008 amendments.

At the same time in 2010, the Department of Homeland Security started their Blue Campaign, and the basics of that is something that we attached to our Complaint as Amendment A.

If you review the Blue Campaign, which we have reason to believe and have alleged in our Complaint that Marriott International received and knew about and should have been using to comply with their -- their obligations under federal law, it outlines the specifics of how a brand can train staff, including the individual clerks at the front desk, the cleaning people in the back room, the security guards, you know, anybody who is sort of on staff -- anybody who is on any of their local

properties that might see signs of human trafficking should recognize, and they had that from the Department of Homeland Security in 2000 --

**THE COURT:** Is this -- is this -- what is this? Guidance from the Department of Homeland Security about what hotel chains should do or what hotels should do?

**MS. ELLIS:** I'm not sure how the Department of Homeland Security describes it --

**THE COURT:** I'm just -- I'm just trying to figure out how that goes to the question of whether the local hotels are agents of the chain in this case.

**MS. ELLIS:** Well, certainly, Your Honor. And I just -- and I'll address that in just a moment.

But just -- I want to explain why I included that in sort of this timeline in the context of what -- how we're asking Your Honor to decide this motion to dismiss under *Ashcroft*.

In 2010, the TVPRA was amended. There was a large national push starting in the Department of Homeland Security targeted on brands like Marriott, who operates in 131 countries and 30 brands and has 7,000 properties, to recognize and fulfill their responsibility and now -- like legal responsibility under federal law.

We -- as I said before, on their website today, we know that they've done that as of 2017. They have said they have done it. They have said they have trained 500,000 people, and

they've made it mandatory.

The issues that we're talking about and whether the agency relationship existed today or during that time, it -- it's within that 2010 to 2016 time frame that we need to look at.

And I appreciate Your Honor's -- I appreciate Your Honor's admonition that we -- I should not say that we need the benefit of discovery, but it goes to the crux of the case. There are two competing theories of this case under the TVPRA, and, admittedly, this is not a robust area of the law. We do not have decisions about agency from hundreds of federal courts and years and years of litigation under this. We do have some decisions that have been issued in the Eastern District of Pennsylvania and the Southern District of Ohio and some other courts that -- that can inform -- inform this Court in your decision, and if you haven't read Judge Kearney's robust decision in the Eastern District of Pennsylvania, I --

**THE COURT:** Yeah. I've read it. To be honest with you, I had a real hard time understanding it. And the problem with that decision is that it bounces back and forth between what the local hotels knew and what the chains knew without specifying. And it -- it's very difficult to untangle from that ruling what -- what the chains were responsible for and liable for and what the -- and what they weren't responsible for and liable for because the -- often just the word "defendants" was used generically without specifying.

And then there was a very brief discussion of agency where the -- the -- the judge assumed that state law applied without -- seemingly without analyzing that, and -- and kind of briefly stating that the -- the local hotels were agents of the chains.

Maybe that's correct, but I didn't find it particularly illuminating. Maybe that result is correct, but I didn't find the analysis illuminating at all.

**MS. ELLIS:** I appreciate that, Your Honor. And I will say that the analysis, I think, is more robust than some of the -- I brought it up because I think it's more robust than some other decisions that we have that are --

**THE COURT:** It's long -- it's longer.

**MS. ELLIS:** Yes. That is true. It is longer.

**THE COURT:** I don't know if that necessarily means more robust.

**MS. ELLIS:** I think --

**THE COURT:** On the -- I'm happy to have you turn back -- I know you want to make an argument about direct liability and -- and the, you know -- we can look at the language of the statute. I think I should probably first hear from the defendants on this agency question -- these agency questions that I asked a couple of days ago.

**MR. O'DAY:** Thank you, Your Honor. This is Mike O'Day on behalf of Marriott.

And so addressing the questions -- and I'll take them in the order you asked them as well.

I think the first question actually about what law governs -- right -- it was stated a number of times that -- what should you look at when a statute is silent as to vicarious liability, and I would submit as an initial matter, Your Honor, as a matter of statutory construction and interpretation, where a federal statute does not expressly show that there is an intention that there be secondary liability available under that statute, you stop there. You don't have to get into whether it's federal common law or state law that would apply because --

**THE COURT:** There are --

**MR. O'DAY:** -- there is no availability of secondary liability.

**THE COURT:** What about like -- what about these other statutes that Ms. Ellis rattled off, the TCPA and the Fair Debt Collection Practices Act, and all of those statutes.

**MR. O'DAY:** Sure. And -- and I'll -- as far as the TCPA goes, because that's -- I'm most familiar with that in looking at it for today -- there is an indication first within the statute itself and then with an FCC interpretation of it that expressly tells judges that secondary liability is permitted. Okay.

So it's from there then that the second level of

questioning of which law applies comes into play. And -- and as far as what 1595 says, this question has been addressed as far as secondary liability goes in a case that was cited in the plaintiffs' brief. This is the *Jean-Charles/Perlitz* case, 937 F. Supp. 2d, 276. And in that case, just like here, the first predicate act violation, the criminal violation, was a Section 1591 allegation, and then the Complaint argued for a 1595(a) civil liability, the same way we do here.

And the court looked at the statute under one of the counts where the plaintiffs were trying to hold secondary liability under a theory of aiding and abetting, and the court, applying statutory construction principles that came out of, you know, Supreme Court jurisprudence, said very clearly that where the text of a federal statute is what becomes dispositive in determining if there is secondary liability and then furthermore, whether statutory silence on the subject of statutory -- secondary liability, it means there is none. So --

THE COURT: Well, what about -- what about *Meyer vs. Holley*, a Supreme Court decision? Have you looked at that?

MR. O'DAY: I have not, Your Honor.

THE COURT: I will admit to you that I also have not looked at it, but my law clerk told me this morning that that stands for the proposition that when a -- when a federal statute is silent on the question, you look to federal common

law.

**MR. O'DAY:** Right. And if you look at federal common law -- well, that doesn't mean -- the question is federal common law for agency, and we believe -- our answer here to -- if -- if we get to that next question would be that it's federal common law that would apply to agency.

We believe that if you were applying a choice-of-law analysis here because the -- the Complaint is a federal question, a federal statute, that it would be federal common law that would apply that looks to the restatement of conflicts.

From there, whether or not under a federal statute there is the existence of agency, we believe that it's federal common law that applies, and that has come up -- and the case we would cite to Your Honor is the *Jones* case, which is out of the Ninth Circuit, at 887 F.3d 443. And, again, that case -- and the Ninth Circuit went through the elements of federal common law agency, looking at, one, where there is actual authority, and I don't think that's what is being pled in this Complaint, but the other form of -- of secondary liability under agency is actual control, and there the court set out and discussed the factors of whether there is actual control over the manner and means.

And I think what's -- what's important in that decision is it makes clear under the control test there -- and this is the

quote coming out of that decision from the Ninth Circuit -- "that it is the extent of control that is exercised by the principle in the essential ingredient that's at issue." And here it would be the day-to-day operations of the hotel.

So it's not just that there is a right, a potential right, for a franchisor to have some control over what goes on at a franchisee, but it is how that control on -- in the day-to-day operations of the hotel -- how that control is exercised by the franchisor.

And we would submit to Your Honor that on -- what's alleged here in the Complaint comes nowhere near establishing facts that would show that Marriott International exercised day-to-day control over the operations of the hotel and the means and the manner which are at issue in this case, and I think your -- your question before --

THE COURT: Well, why -- why -- why is that not -- why is that not captured in the paragraph that Ms. Ellis pointed us to earlier on page 18, subparagraph 6? I think it was paragraph 87.

MR. O'DAY: Sure. And -- and, Your Honor, I think the --

THE COURT: We do have to read -- you know, I mean --

MR. O'DAY: I would --

THE COURT: You know, it sounds like they could have put in a lot more -- it sounds like from the discussion that I

had with Ms. Ellis that they could have put in a lot more on agency liability than what they put into the Complaint, and I think it's probably a product of, you know, the agency liability question. Nobody -- nobody's really drilled down on it yet, but -- because the focus has been on direct liability or whatever, but we are supposed to read, you know -- read these allegations in these Complaints charitably.

And why doesn't that paragraph get them past the motion to dismiss stage on the -- on the question of agency liability?

**MR. O'DAY:** Yeah. Sure.

First of all, I don't think anything that Ms. Ellis said -- it's not as if they have facts that they just left out of the Complaint here. I don't think that's the case.

I think reading off Marriott's website from 2017 does nothing to inform the Court about the specific trafficking and incidences of K.R. between 2006 and 2016, which occurred at a Westin property which -- and is also alleged in the Complaint and it's true, that's a Starwood property, and prior to 2016, Starwood was a completely different company from Marriott. So we're here solely because Marriott has acquired Starwood, but that acquisition postdates the allegations in this Complaint.

So talking about what Marriott did back in 2006 or talking about what's on Marriott's website in 2017 we don't believe is a fact that helps prove any type of -- of claim here.

**THE COURT:** Okay.

**MR. O'DAY:** So just putting that aside, getting to your specific question on what's alleged here on page 18 and 19, these are just -- these are not facts that go to the day-to-day operations to show that Marriott International was exercising control over daily operations. Having online bookings using Marriott's domain name -- and one thing let me just say, Your Honor --

**THE COURT:** Okay. Well, what about -- let's -- let's -- I mean, some of them I agree, but making employment decisions, standardized training methods for employees, building and maintaining a facility in a manner specified by the owner, standardized or strict rules of operation on regular inspection of the facility -- I mean, all of that -- I mean, if you -- if you take that in its -- you read it charitably, why is that -- why is that not enough to say that, you know, with respect to the question of how hotel employees conduct themselves with respect to, you know, obvious sex trafficking operations, that the chain exercised control over that.

**MR. O'DAY:** Well, because simply saying that -- first of all, I -- you know, basically we have to assume these are true. I question where some of -- the basis for some of these allegations come from and how they were able to make them here.

But I would -- two things. One I would say the *Patterson* case out of the Supreme Court of California -- it's a 2014 decision -- we cite it for the standard it does a very nice job

of explaining how franchise law operates and what rights that franchisors might exercise, are required to exercise in order to protect their mark and their goodwill, and it talks about -- and there is a whole body of law out there that talks about things of -- having brand standards and that the franchisors are required to have these to make sure of the goodwill of their mark under the Lanham Act, and there is a whole layer of federal law placed there.

So -- and we cite cases in our brief that have these exact same indicia that are being cited that on summary judgment, that was the undisputed evidence that was before the court, and in evaluating that on a summary judgment, the court said that's not enough to let this case go forward.

We've also cited even cases on motions to dismiss on 12(b)(6) where federal courts have looked at things very similar where the allegation is a right to control training, a right to do inspections, a right to terminate the franchise for non-compliance, the right to have rules of operations. Those -- we -- if you look at the case law that has addressed those, that's not enough for day-to-day control to give rise to vicarious liability; otherwise, this franchise model would come crumbling down.

Every -- every time something bad happened at a franchise property, whether it's a restaurant or a hotel, you name it, the franchise -- a Starbucks -- if you could turn around and

say, well, there's training and therefore the franchise -- I can just go directly to the franchisor and bypass the people who actually were there, the people you dealt with -- and here it's the individual hotels.

So I think having the right to inspect, that -- that is not enough as a matter of law. Looking at the 12(b)(6) cases we've cited that have held that, I think if you looked at the *Cha* case which is a motion to dismiss case, there the allegations were involved with site selection, training, marketing, purchasing, and personnel selection. None of those facts were enough for the federal court.

In the *Acedo* case, which is a California court, Central District, there they applied Michigan law. They are trying to hold General Motors, the company, the parent General Motors, responsible for manufacturing and repairs at GM franchise facilities. And what was alleged there --

**THE COURT:** So -- could I -- could I -- sorry. Could I interrupt for just a sec?

**MR. O'DAY:** Yes, Your Honor.

**THE COURT:** The case you cited in your brief was a case applying state law of agency liability. Is that -- am I correct about that?

**MR. O'DAY:** That is correct.

**THE COURT:** So you didn't cite any federal common law of agency liability. I mean, maybe the law is the same, maybe

it's different.  I have no idea.  I haven't looked into it yet.

But you didn't -- you didn't -- what you're saying now is that

in your briefs, you were arguing the wrong law; is that

correct?

**MR. O'DAY:**  No, Your Honor.  I think --

**THE COURT:**  You were arguing federal common --

**MR. O'DAY:**  We --

**THE COURT:**  Sorry.  Just to specify what I'm asking,

it seems like what you've said now is *we should have been*

*arguing federal common law of agency liability, and instead we*

*argued state law of agency liability*.  Is that right?

**MR. O'DAY:**  What we -- what I'm saying, Your Honor, is

that under the federal standard that was articulated, it's the

right -- the actual exercise of the day-to-day control, that is

what we also argued in our briefs, that there was not

sufficient allegations.

So whether -- we did not cite, I agree, federal common law

cases, but that federal common law of agency comes out of the

Restatement (Second and Third) of Agency for which many states

have also borrowed their agency law from it.

So I don't think there's inconsistency.  I -- but I

will -- yes.  We did not cite those federal common law agency

cases.  But applying that standard, I mean, we also cited --

you know, we didn't just cite California law either.  We wanted

to show Your Honor that the things -- how the standard is

actually applied and that it can be applied by you at a 12(b)(6) stage. And I've also, under federal common law, found cases where it's under federal common law -- again, it was a TCPA case -- where, you know, failure to allege and failure to plead under federal common law of agency also can be subjected to 12(b)(6).

THE COURT: Might -- might -- might there be -- might there be an argument for asking you all to file supplemental briefs on these -- on these questions, you know, to get -- so that I -- I'm sure I have all the -- all the material that I need and all the sources I need to figure out the answer to this question?

MR. O'DAY: Supplemental briefs referring to, Your Honor -- would be on this issue of federal common --

THE COURT: On the questions that are raised in the order a couple days ago.

Let me ask Ms. Ellis -- and I want to ask you one more question about this agency business and then you can -- you can turn to the stuff that you wanted to talk about.

Have you -- do you believe -- you know, sort of in light of this discussion, do you believe that you've taken your best shot in the Complaint at setting forth factual allegations that would give rise to agency liability?

MS. ELLIS: Your Honor, I believe that --

THE COURT: It seems to me -- you know, a lot of

times, you know, these -- these discussions seem to, you know, lead to the conclusion that -- that, you know, a lot more can be done in that area, and I'm wondering if this is a situation where, you know, a lot of times after a hearing like this, the plaintiff will say, You *know what?  We'd like to request leave to amend our Complaint because this discussion has shown that there was a lot more -- a lot more drilling down that we could have done on this claim that we're making, and, you know, a lot more -- you know, we could have alleged with a lot more specificity and a lot more clarity what our theory of liability was*.

And, you know, so -- that's why I'm asking.  Is this your best shot at alleging agency liability for the change?

**MS. ELLIS:**  Your Honor, I certainly wish I could have drafted the Complaint with the hindsight of this hearing; however, I did not have that benefit at that time.  Certainly I can improve it in light of this discussion.

What we've alleged is direct and indirect liability under 1595 --

**THE COURT:**  So why don't you -- if you -- you know, if I have -- if I have serious concerns about whether you've alleged direct liability, and we've -- we've sort of -- we've highlighted all of the problems with your allegations regarding indirect liability, why -- why not just -- why not just ask for -- seek leave to file an Amended Complaint in light of

the -- in light of this discussion?

MS. ELLIS: Well, I would first ask Your Honor that we -- certainly. I'm happy to ask that. And I can spell this out a little bit more.

I do want to come back to a couple of points addressing what Mr. O'Day said, and then -- before we go on, but I do think that the opportunity -- if we don't do that, the opportunity to brief these questions before you would make any motion or make any decision on the motion would be appreciated and appropriate.

THE COURT: Yeah. Or maybe the more efficient way to do it is for you to just request leave to file an Amended Complaint, you know.

But anyway, go ahead.

MS. ELLIS: Well -- certainly, Your Honor. I hear you, and -- I hear you.

I will point to the Complaint. First of all, with *Meyer*, I would encourage Your Honor to read *Meyer*. It's a Supreme Court decision.

THE COURT: I'll read it.

MS. ELLIS: Okay. It was -- it was -- the Ninth Circuit has since interpreted it in 2014 in *Gomez*, and there they found vicarious liability under the TCPA using federal common law agency standards. And so there is some -- some history around what's happened with that case.

I do want to speak to the issue of actual control in the agency discussion because I do think that this is laid out in our Complaint, and perhaps it was not laid out as clearly as it could have been --

**THE COURT:** Because the paragraph you pointed me to says, "This agency relationship was created through Marriott's exercise of an ongoing and systematic" -- "systemic right of control over the day-to-day operations of Westin Hotels."

**MS. ELLIS:** Yes -- yes, Your Honor. And that goes to the *Patterson* case that Mr. O'Day was just discussing. He is correct that -- first of all, that was a case that was decided on summary judgment and not at the motion to dismiss stage, and there was nothing in the *Patterson* case that limited the liability of a franchisor like Marriott who retained or assumed the right of general control over day-to-day operations. So I think that that case is different than how they would ask that it applies.

When we look at paragraph 87 in our allegations of actual agency and control, I would like to direct Your Honor to subsection 7, 9 and 10, because those are the real subsections and the issues of control that we're talking about with respect to sex trafficking that occurred under the Marriott brand and at the specific hotel chain.

And so we know from the sample franchise agreement that we found out there in the -- in the internet that these are some

things that are accounted for in some of Marriott's franchise agreements with local hotels.  We also know from what I've pulled up, not from 2017, but from --

**THE COURT:**  Where is that in the Complaint?  I mean, you -- the problem is -- and this is why I keep raising the question of whether you just want to ask for leave to amend your Complaint -- is you keep pointing to stuff that's not in the Complaint in support of your argument that, you know, Marriott -- that the local hotels are acting as agents of the chains with respect to this issue.

**MS. ELLIS:**  So I'll direct Your Honor back to paragraph 60 and the -- both -- I'm sorry.  Paragraph 60, as well as --

**THE COURT:**  You were pointing me to subparagraph 9 of paragraph 87, and I'm just --

**MS. ELLIS:**  7, 9 and 10 of paragraph --

**THE COURT:**  Okay.  So looking at 9, what does that have to do with agency?

**MS. ELLIS:**  Standardized or strict rules of operation? It has to do with the control that the brand -- paragraph 87, Marriott was in an actual and/or apparent agency relationship --

**THE COURT:**  Okay.  I see.  Sorry.  This --

**MS. ELLIS:**  Sorry if I was not --

**THE COURT:**  Subparagraph 9.  You're referring to

subparagraph 6, item 9.

MS. ELLIS: I apologize, Your Honor. I was not as -- so reading those three specific allegations of agency authority in light of paragraph 63 in the Complaint, that as early as 2006, Marriott embraced a policy of stopping trafficking from occurring at its -- across its brand, including at its local hotels.

I think there's also, as provided for in the reagency -- or the Restatement of Agency an argument for ratification here, that by allowing these hotel clerks to continue to operate in the way that they did, both across the brand and in this particular case -- and I'm happy to highlight some facts that we've alleged in the Complaint to show that this is what happened --

THE COURT: That -- that you do a good job of. I mean, you do a good job of showing what happened at the local hotel or the local hotels. It's --

MS. ELLIS: Yes.

THE COURT: But what you -- what you do not appear to have focused on is, you know -- you know, the distinction between what the employees at the local hotels knew and what the chains knew and what the -- and what the chains had control over and what they didn't have control over.

MS. ELLIS: Well, I -- I think that we have possibly -- I believe that we've met the standard at this point

under *Ashcroft* with the plausible -- viewed in the light most beneficial to the plaintiff and looked at in the context of the timeline that we went through, I believe that we meet the standard for a 12(b)(6) motion.

THE COURT: Okay. Do you want to talk -- do you want to address the -- the question of direct liability?

MS. ELLIS: I do, are Your Honor.

Just one last point on that. I do believe there is a ratification argument that is outlined, although not explicitly with that language, in our Complaint for agency liability based on the 2006 Marriott policy against human trafficking and their, really, acceptance of what was happening at the local hotels when it came to local desk clerks accepting cash from people like K.R. for weekends in bulk, when it came to checking people in with visible head injuries that, you know, very clearly could be victims of crimes currently in progress, and particularly in light of this being an airport hotel with a steady line of johns, for lack of a better term, walking in and out, presumably without suitcases, and so --

THE COURT: But you're -- you're -- again, you're talking about the what the local -- what the local hotels knew, and as I have said, you have done a very good job of showing -- I mean, you chose not to sue the local hotels. Had you chosen to sue the local hotels, it would seem very clear to me that you have stated a claim for violation of this federal statute

against the local hotels.

But -- but by continuing to point to the conduct of -- of the local hotels, you're blurring the liability question that I'm trying to pin you down on, and that's the problem with the case out of the -- out of Pennsylvania as well, is --

**MS. ELLIS:** I appreciate that.

**THE COURT:** So --

**MS. ELLIS:** The point I was trying to make -- (inaudible) --

**THE COURT:** I want to give you -- I want to make sure you have an opportunity to talk about the direct liability, so why don't you go ahead and turn to that.

**MS. ELLIS:** We do believe that the TVPRA provides for direct liability, and we can talk about the language of the statute itself, but I want to go directly to what I think in your tentative thinking outlined in your order to us with the questions I think is the issue that you have, is that they -- the -- Marriott, as the corporate parent, themselves participated in that venture. Is that fair?

So, Your Honor --

**THE COURT:** That they participated -- they participated -- I'm looking at the actual language of the statute. That they participated in a venture that they -- that has engaged in an act of sex trafficking.

**MS. ELLIS:** Correct, Your Honor. So I would like to

focus on that.

So in the statute, we think that there are really three -- three separate questions that we need to answer about direct liability.

At the outset, we believe that the brands are both directly and indirectly liable under the language of the statute simultaneously. To prove direct liability -- I'm looking at the plain language of the statute -- we need to show that there was a known benefit financially, which we have -- we have plausibly pled, and we believe that we can prove, and I anticipate --

**THE COURT:** I want to -- I think we should focus on the thing that you started to focus on, which is participate in a venture which has engaged in an act of sex trafficking.

**MS. ELLIS:** Certainly, Your Honor. Well, let's --

**THE COURT:** So the venture -- as I understand it, the venture -- there is a venture between -- as you've alleged it, right, there's the -- there are the -- there are the -- the sex traffickers, right --

**MS. ELLIS:** Yes.

**THE COURT:** The -- you know, the actual -- the actual participants in the -- in the act, and then there's the -- the hotel employees that are -- know that it's happening, and they are seeing it happening, and they know that they're profiting from it, and they're facilitating it; right? So you have the

local -- you have the local hotels facilitating these acts of sex trafficking, essentially cooperating with the sex traffickers, and --

MS. ELLIS: Well, Your Honor --

THE COURT: And -- and there is a venture, essentially, between the -- as you've alleged it, between the local hotels and the -- and the sex traffickers; right?

And so the question is whether the -- that you've adequately alleged facts to show that the -- the chains have participated in that -- in that venture. Isn't that -- isn't that the question, or am I misunderstanding the question?

MS. ELLIS: That we've adequately alleged these facts? Certainly that's the question, Your Honor --

THE COURT: Adequately alleged that the chain has participated in the venture that I just described. That's the --

MS. ELLIS: Yes, Your Honor.

THE COURT: Right?

MS. ELLIS: Yes, Your Honor.

And I will use some examples and -- some examples specific to the chain that we -- I believe are encompassed within what our pleadings say today and would meet the standard for -- to survive a motion to dismiss.

Because of the brand's ability and vast control over all of the brand properties within its -- within the Marriott name,

all 30 brands, 7,000 properties, you know, everyone using the Marriott Bonvoy Rewards Program, all of that, we've alleged that control exists in that way.

THE COURT: You've gone back to -- it seems like you've gone back to agency liability now. But -- but --

MS. ELLIS: We have not, Your Honor.

THE COURT: I thought you were trying to articulate a theory of direct liability, but you've just gone back to the concept of control over every aspect of the local hotels, and so it sounds like you're saying agency liability.

MS. ELLIS: I apologize. I was trying to recap, and I didn't move quickly enough.

In addition to all of those things that we allege, they have control over things like the internet that is in every Marriott hotel room in the entire brand of -- of their name, and so when we're talking about participating in a venture -- and this is something that we are going to want to look at in discovery -- we know that sex trafficking happens through websites like the now ceased backpage.com, through Craigslist, through other sorts of entities like that, and that Marriott knew as early as 2006, certainly in 2010 when they had liability under federal law, that they had an affirmative obligation to look for these things happening in their hotel brands, and that actually goes back to 2008.

And so I looked again today and found Marriott's internet

policy saying that they can block, filter, restrict, anything that's illegal or subject to, you know, the laws of this country. So if they failed to do that, they had a federal responsibility -- they had a responsibility under federal law to do that. They failed to do it. They allowed the traffickers to access websites like Backpage to post the opportunities for johns to come and go on a daily basis from within their own walls, and they have the ability to recognize that this was happening at a regular basis, perhaps more frequently at airport hotels than any other types of hotels within the --

THE COURT: Wait a minute. Are you saying that Marriott had the ability to control Backpage?

MS. ELLIS: No. I'm saying Marriott had the ability to understand that Backpage was being accessed from within their walls. And if -- and if they did, which we believe that they did, they should have taken steps to either, one, stop it; two, show that that was a red flag to stop the illegal --

THE COURT: And where is that -- where is that in the Complaint about Marriott -- about sites like Backpage being accessed within Marriott's walls and Marriott having a policy that it controls that traffic and -- and --

MS. ELLIS: I will direct you to paragraph 87, Your Honor. You know, another example that -- paragraph 87 of our Complaint. I believe it's encompassed within there. It's

not specified in that way, but I do believe --

THE COURT: Okay.

MS. ELLIS: All of these types of items are included within those subsections that we outline.

And just one more example that we believe is included, anytime that I've ever stayed at a Marriott Hotel and I've seen something that's gone wrong, certainly you can go to local staff and complain, but every time they have told me to call 1-800-MARRIOTT and report it there, and that happens across the brand, and it would have happened at this local hotel, too.

If any of these complaints about this trafficking of K.R. or anyone else who is coming in from this hotel or any other hotel in the country or the world, they were getting notice of those complaints through their corporate systems. And we have reason to believe that that was happening. And that there --

THE COURT: You said that's not in the Complaint?

MS. ELLIS: I believe that it is in the Complaint, Your Honor. I believe that it is encompassed within paragraph 87.

THE COURT: Okay.

MS. ELLIS: I think that --

THE COURT: I mean -- so let me ask you again. Have you -- do you think that you've taken your best shot at showing why Marriott is liable for this conduct? Do you think this Complaint -- I mean, you spent so much time in this hearing

talking about stuff that's not in the Complaint or making reference to how something could have been drafted better in this Complaint.

So have you taken your best shot -- I mean, if you've taken your best shot, it seems to me that what that means is that if I believe that you haven't stated a claim, I could dismiss it with prejudice because you've insisted that you've taken your best shot; right?

What other position you might take is that this hearing has uncovered a variety of deficient problems in the Complaint such that -- maybe you believe that you have stated a claim, maybe you are concerned now that you haven't. I don't know. But, you know, you might take the position that this is not close to the best shot -- your best shot, and that you might want to request leave to file an Amended Complaint.

So what's your -- what's your view? Do you want -- do you you -- is this your best shot, or do you want to -- do you want to request leave to amend your Complaint?

**MS. ELLIS:** Your Honor, I will file a motion by the end of the week requesting leave to amend. I would -- I would ask --

**THE COURT:** You don't have to file a motion. You can just ask me now.

**MS. ELLIS:** Your Honor, I would like leave to amend the Complaint, and I would ask that you hold any decisions on

the motion to dismiss in abeyance until you decide on my motion.

THE COURT: On -- on their motion? I mean, if you file -- if I give you leave to file an Amended Complaint, I will just deny the motion and dismiss as moot.

MS. ELLIS: Okay. I move for Amended Complaint then, Your Honor.

THE COURT: Okay.

Mr. O'Day, is there anything you want to say about that? I mean, I would give them leave to amend anyway; right? I mean, you wouldn't -- you couldn't reasonably argue, I would think at this early stage, that the Complaint should be dismissed with prejudice, could you?

MR. O'DAY: Your Honor --

THE COURT: Unless you were -- unless they were to say, *This is our best shot. We've alleged everything that we've allege*d.

MR. O'DAY: Understood. And -- and picking up on what Your Honor is saying, the only thing I want to note is this already is an Amended Complaint that we are looking at. They already did take one shot to try to address some of the shotgun pleading and factual deficiencies. So as long as -- just to note that, you know, we have already done this one time, but we'll -- we'll see what their best shot is on the next one.

THE COURT: I mean, the only other comment I will make

is that this reminds me -- this feels a little bit like a -- a securities fraud Complaint where -- where they do -- you know, they just -- they throw in a ton of stuff and they hope something sticks, but they haven't articulated a -- sort of a coherent theory of liability. They've just thrown in a bunch of stuff in the hopes that something is going to stick.

And I think the problem in securities fraud cases oftentimes is that, you know, a Complaint is dismissed -- dismissed with leave to amend and then instead, the plaintiffs -- instead of going back to the drawing board and saying *okay, let's start over and let's try to clearly articulate our theory of liability and put in all the factual allegations that support it*, they just add a bunch of stuff to this already very confusing sort of poorly-drafted Complaint. And I'm a little bit concerned about that happening here because I think that, you know, one of the problems with the Complaint here is, you know, as I said, it's also a problem with the decision in, you know -- out of Pennsylvania, that it just bounces back and forth in a very vague way between what was known by the local hotels and what was known by the chains, and it -- it -- and it doesn't really articulate a coherent theory of agency liability as applied to the question of whether the -- the local hotels acted as agents with respect to, you know, the conduct -- the misconduct at issue in this case.

So I'm -- you know, the request to -- to file -- to -- leave to file an Amended Complaint is granted, but I would urge you not to do what I see happen -- see so often in these securities cases, which is just adding more stuff to an already difficult-to-understand Complaint as opposed to going back and really thinking about the discussion we had here today and -- and researching the law, federal common law, and -- and figuring out what needs -- you know, what the -- you know, what the -- what -- what the necessary factual allegations are and what doesn't need to be in the Complaint.

But, anyway, so the request is granted.

How long do you want to file an Amended Complaint?

**MS. ELLIS:**  Is 28 days too long, Your Honor?

**THE COURT:**  I mean, I was going to say 21.  Why don't we make it 21 -- if you want 28 -- it's a weird time; it's harder to do things now -- that's fine.  Twenty-eight days is fine.

**MS. ELLIS:**  We'll try to get it done in 21.

**THE COURT:**  All right.  Well, why -- so an Amended Complaint is due in -- 28 days from today, no later than 28 days from today.

The response to the Amended Complaint is due 14 days thereafter.  I'm assuming it will be a motion to dismiss, and I assume we'll all talk again at some point.

**MR. O'DAY:**  Your Honor, just briefly, the one thing

that's on your calendar is a case management conference, and we would request that that be put off until after we get through this next Complaint and round of briefing.

THE COURT: Sure. What -- when is the CMC right now?

MS. ELLIS: I believe it's currently scheduled for July 17th. The conference is after that.

Melinda, do you have those days?

THE COURT: So what I'll ask you all to do is meet and confer on when you think the hearing should be on the next motion to dismiss, and then, you know, the case management conference can be like, you know, a couple weeks after that. So -- and then you can go ahead and submit a stipulation with all those dates. Okay.

MS. ELLIS: Okay.

MR. O'DAY: Thank you, Your Honor.

MS. ELLIS: Thank you.

THE COURT: All right. Anything -- anything else right now?

MS. ELLIS: No, Your Honor.

THE COURT: Okay. Thank you.

(Proceedings adjourned at 11:46 a.m.)

<u>CERTIFICATE OF TRANSCRIBER</u>

I, Pamela Batalo Hebel, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

DATE: Thursday, June, 11, 2020

*Pamela Batalo Hebel*

_____

Pamela Batalo Hebel

Exhibit A
Page 54